NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 230191-U

NO. 4-23-0191

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| MARTIN WALGENBACH, | ) | No. 20CF97 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The State's evidence was sufficient to establish defendant's guilt beyond a reasonable doubt of leaving the scene of a motor vehicle accident involving personal injuries.

¶ 2    Following a bench trial, defendant, Martin Walgenbach, was convicted of leaving the scene of a motor vehicle accident involving personal injuries (625 ILCS 5/11-401(a) (West 2020)) and sentenced to 30 months' conditional discharge. He appeals, arguing the State failed to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In February 2020, the State charged defendant with leaving the scene of a motor vehicle accident involving personal injuries (*id.*). In August 2020, a grand jury returned an indictment charging defendant with the same offense. The charge was based on allegations that

defendant struck a pedestrian, Elizabeth Ciavarella, with his vehicle outside of the Par-A-Dice Hotel and Casino in East Peoria, Illinois, and left the scene of the accident.

¶ 5    Defendant waived his right to a jury trial, and the case proceeded to a bench trial in October 2022. Evidence showed that the incident occurred on January 23, 2020, at 8:12 p.m. in the casino's parking lot area. Ciavarella testified for the State that she was employed by the casino and worked until 8 p.m. that day. As she was leaving work, it was dark outside, rainy, cold, and "starting to sleet and snow a little bit." Ciavarella walked through the casino's "first parking lot" on the left side of the lot's roadway and came to an intersection with a stop sign. She stopped at the intersection and looked to make sure no cars were coming. Ciavarella observed a car traveling from the valet area of the casino and decided to wait until the car stopped and went through the intersection before proceeding to her own car. She saw that the driver was a Caucasian male and that he looked at her. Ciavarella made an in-court identification of defendant as the driver of the vehicle.

¶ 6    Ciavarella testified she waited at the stop intersection so that the driver "could go through." However, after the driver did not move, she "figured that he was going to let [her] go on through first." She started walking, making it about halfway across the road to the casino's "second parking lot," when she felt something hit her on her right side and "went flying." Ciavarella landed on the asphalt and felt pain in her elbow and right shoulder. As she lay on the ground, she saw the car stop and observed the back of the vehicle. Ciavarella heard the man in the car honk his horn and stated he then "took off" or "drove off."

¶ 7    Immediately following the impact, Ciavarella could not get up. Eventually, however, she got to her feet and "roam[ed] around" the area where the accident occurred until a woman named Connie came up to help her. Ciavarella told Connie what had happened, and Connie

went to get help. Ultimately, Ciavarella went to the hospital, where X-rays showed she had two broken bones in her elbow. She later underwent surgery for her injury.

¶ 8        The State presented testimony from casino employees that showed the casino had valet services at the time of the accident and surveillance cameras that monitored its valet and parking areas. It presented surveillance video that showed defendant retrieving his vehicle from the casino's valet at 8:11 p.m. on the night of the incident. After retrieving his vehicle, defendant proceeded on a road that extended around the outside perimeter of a parking lot in front of the casino. Ciavarella, dressed in dark-colored clothing, was walking on the same road in the same direction as defendant and positioned on the driver's side of his vehicle. The two arrived at a stop intersection at approximately the same time, around 40 seconds after defendant got into his vehicle at the valet station. From the intersection, drivers could either continue straight or turn left onto a road that ran between the casino's two parking lots. The surveillance video showed Ciavarella walking across the intersection. As she crossed, defendant, who had been stopped, made a left-hand turn, striking the right side of Ciavarella's body with the front of his vehicle near its passenger-side headlight. Approximately nine seconds elapsed from when defendant stopped his vehicle at the stop intersection and when he struck Ciavarella with his car. The impact caused Ciavarella's head and upper body to roll toward the hood and windshield of defendant's vehicle, with Ciavarella subsequently landing on the pavement on the vehicle's passenger side. After the impact, defendant's vehicle stopped for two to three seconds before continuing forward, leaving the scene.

¶ 9        Frances Seward testified she was a shuttle driver for the casino and responsible for transporting its employees and guests. She was driving her shuttle on the evening of the accident and observed a woman named Connie helping Ciavarella "get up off the ground." Seward called

security, who brought Ciavarella to Seward's shuttle, where she remained until emergency personnel arrived at the scene.

¶ 10 Rachel Giffhorn, a police officer with the City of East Peoria, testified she investigated the accident. She recalled that at the time, it was cold and wet outside and, at some point, it had been snowing. When she arrived at the scene, Giffhorn observed Ciavarella sitting in a shuttle bus in the casino's parking lot. Ciavarella was upset, stated that she had been hit by a car, and reported that "she was hurt." The driver of the vehicle involved in the accident was not present at the scene. A video from Giffhorn's body-worn camera was admitted into evidence, and a portion of the recording was played for the trial court.

¶ 11 Giffhorn further testified that after speaking with Ciavarella, she went inside the casino and reviewed the parking lot surveillance video. She received the license plate of the vehicle involved in the accident from the casino's valet. Giffhorn "ran the license plate through dispatch" and learned it was registered to defendant. Later, defendant was located at his residence and arrested. Giffhorn testified she also inspected defendant's vehicle and found no damage.

¶ 12 During defendant's case-in-chief, his wife, Julie, testified that on the evening of the accident, she drove in her own vehicle to the casino to meet defendant for dinner, arriving at around 6:15 p.m. As the two were leaving the casino around 8 p.m., it was sleeting and very dark. The ground was also wet. Julie testified defendant entered his car at the valet area while she proceeded to walk through the parking lot to her own vehicle "out in general parking." She recalled seeing defendant's vehicle as she crossed the road between the casino's two parking lots. After she arrived at her vehicle, defendant drove past her, and she followed him home. She denied hearing "anybody honking a horn" as she walked to her car.

¶ 13 Defendant testified on his own behalf that on the day of the accident, he arrived at

the casino around 4:45 p.m. He "play[ed] craps" and drank two beers before meeting his wife for dinner. When leaving the casino, defendant retrieved his car from the valet. He stated it was dark outside and described the weather conditions as sleeting and snowing. Defendant also recalled that the roadways were wet. When he entered his vehicle, it was "warmed up" and the windows "were pretty fogged up." He testified he drove his vehicle out of the valet area and proceeded to a location where there was a stop sign, stopping "thoroughly." After stopping, defendant "observed a pedestrian walking on [his] left-hand side." He stated he decided to proceed onward from the stop sign by making a left-hand turn. He denied seeing anyone when he began turning left. While turning, he "heard a noise, but didn't see anything." He stopped his vehicle and looked around, using his side and rearview mirrors, but saw no other vehicles or pedestrians. Defendant then "proceeded on." He denied that he saw "any person being struck in front of [his] vehicle" or any person lying in the road.

¶ 14        On cross-examination, defendant testified that after retrieving his vehicle from the valet, his "defrosters" were on and he could see through the windshield. Again, defendant recalled seeing a pedestrian to his left after arriving at the stop sign. When he proceeded after stopping, he did not see the pedestrian. As he turned left, he was looking left at the road. Defendant described the road as "dark and blurry," with "a lot of glare on the parking lot *** from the lights." He stated he "heard a bump" but did not see any vehicles or a pedestrian. Defendant stated he assumed he hit an "island or a median" but acknowledged that he did not see an island or median either before or after making his left-hand turn. Again, defendant stated that he stopped and looked around using his mirrors but saw no vehicles or pedestrians. He stated his windows were sufficiently "unfogged" at that time and that he could see his mirrors.

¶ 15        Defendant also presented the testimony of Dr. Manuel Meza-Arroyo, a senior

consultant with Engineering Systems Incorporated. Meza-Arroyo testified he was employed by the defense to use his "engineering expertise" and conduct a "[t]ime-distance analysis, human factors consideration, and visibility evaluation" of the incident involving defendant and Ciavarella. Meza-Arroyo stated he reviewed videos and reports related to the case. Additionally, in January 2022, he performed a "site and subject vehicle investigation" by visiting the accident site with defendant's vehicle and using an "actor pedestrian" to recreate the approximate conditions of the accident.

¶ 16         Meza-Arroyo testified his examination included a time-distance analysis "to gain an understanding of the relative positions of both the vehicle and the pedestrian *** at the area of impact." A second component of his evaluation was "human factors considerations," which he described as follows:

> "[W]e look at different components that affect the way that humans process information. Human practice, in general, has to do with stimuli in the brain itself or the body of a human and the environment in which these things happen. So we try to take a look at the visual information that would have been available to [defendant] and—and which conditions—in other words, the environment. What sort of conditions existed there when he was trying to perceive this stimuli."

Meza-Arroyo noted that Ciavarella had been wearing dark-colored clothing at the time of the accident. Also, surveillance video showed precipitation, which caused light to be reflected off the pavement. Meza-Arroyo stated such circumstances would create " 'visual clutter' " and make it difficult for drivers to detect objects between the reflections. He opined that Ciavarella's "clothing, along with the environmental conditions, would of [*sic*] provided low contrast or minimum contrast for *** purposes of *** visual perception." Under such conditions, a pedestrian "would

have been harder to detect."

¶ 17    Meza-Arroyo testified that his investigation further included a visibility evaluation, which involved recreating the positioning of defendant's car and Ciavarella at the time of the accident, matching lighting conditions, and obtaining defendant's "eye height" to determine and document "what was available to be seen" when the accident occurred. He further opined that there were periods of time when the "A-pillar" of defendant's vehicle would have "occluded the presence *** of the pedestrian." Based upon all the relevant circumstances—including environmental factors, window fogging, the motion of defendant's vehicle and Ciavarella, sight line occlusions, and Ciavarella's dark-colored clothing—Meza-Arroyo testified it was his opinion that it would have been "unlikely" or "challenging" for defendant to notice the presence of a pedestrian on the night of the accident. On cross-examination, Meza-Arroyo agreed that although the results of his analysis indicated a pedestrian would have been difficult for defendant to detect at the time of the incident, such was not impossible.

¶ 18    As part of his case, defendant introduced various photographs into evidence. The photographs included several still images taken from the surveillance video.

¶ 19    Ultimately, the trial court found defendant guilty of the charged offense. In setting forth its decision, the court found that an accident had occurred on January 23, 2020, and that Ciavarella had suffered "significant injury" as a result. It noted the disputed question in the case was "whether *** defendant knew that he struck the victim." As to that question, the court found the surveillance video and still photos from that video were "illuminating." It determined the surveillance video showed defendant and Ciavarella were "side by side" at the stop sign and that Ciavarella was "literally 90 degrees from [defendant] from the driver's side door." The court further pointed out that both Ciavarella and defendant "stated that they saw each other." It went

on to find that at the moment of impact, Ciavarella was "clearly in front of the car, she's clearly in front of the windshield" near the right side of defendant's car. The court further stated that Ciavarella did not suffer "a slight hit"; rather, "[s]he went in the air. She was sideways at one point in time before she hit the ground on the far side of the car. She went sideways. So she got clipped and she got clipped pretty—pretty well."

¶ 20 The trial court also noted defendant's testimony that he "heard a bump" that he assumed was an island or a median, as well as his admission that there was no island or median in the parking lot. Finding defendant knew that he had hit a person, the court stated as follows:

"I think a couple things are likely to have happened. I think one is that he knew she was there. His testimony states that he knows she was there. Neither one knew which was going first. She decides to go off. He gives her that period of time to go off and she gets quite a bit into the—into the intersection.

He proceeds and she's still in a spot where he proceeds into her. Either she didn't cross fast enough, or he misinterpreted the speed with which she was crossing the crosswalk, or whatever factor. I don't know. But at the point in time that he turns and she's in the headlamps, he hits her. Knows he—that he hit something because he said he heard it.

* * *

But the fact of the matter is he hit someone, he knew he hit someone based on his testimony and all other relevant factors, and he left the scene."

¶ 21 In November 2022, defendant filed a posttrial motion requesting a judgment in his favor or a new trial. He argued, in part, that the State failed to prove his guilt beyond a reasonable doubt because the evidence was insufficient to show he knew that he was involved in an accident

and that the accident involved a person. In January 2023, the trial court conducted defendant's sentencing hearing. At the outset of the proceeding, it heard and denied defendant's posttrial motion. Relative to defendant's sufficiency of the evidence claim, the court noted that it had specifically stated "on the record" that it found the evidence adduced at trial showed defendant knew he had hit the victim. The court explained its determination, stating as follows:

> "I didn't rely just on the video. There were a number of still photographs, blown-up photographs that were all introduced. I took all of those into consideration, all the testimony of everybody that took the stand.
>
> In reaching my conclusion, I did feel and I did find and I still find that the Defendant was proven guilty beyond a reasonable doubt and that he knowingly hit this woman and that he left the scene of that accident."

¶ 22 The trial court then proceeded with defendant's sentencing hearing, sentencing him to 30 months' conditional discharge, 910 hours of public service work, and 90 days in jail. The court ordered defendant to serve 30 days in jail beginning on March 3, 2023, with the remainder of his jail time stayed and held in remission until March 3, 2025. In February 2023, defendant filed a motion to reconsider his sentence. Following a hearing on that motion, the court stayed defendant's entire jail sentence pending a remission hearing, which was to be held in January 2025.

¶ 23 This appeal followed.

¶ 24                                II. ANALYSIS

¶ 25 On appeal, defendant challenges the sufficiency of the evidence against him. He argues the State failed to prove a necessary element of the charged offense—that he knew the accident involved a person. Noting his own testimony and that of his expert witness, defendant contends the unrefuted evidence showed he did not see Ciavarella "either at the time of impact or

after."

¶ 26    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, a reviewing court must determine "whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Conway*, 2023 IL 127670, ¶ 16. "This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial." *People v. Jackson*, 2020 IL 124112, ¶ 64. "[C]ircumstantial evidence that meets this standard is sufficient to sustain a criminal conviction." *Id.* Further, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. On review, "[a]ll reasonable inferences are drawn in favor of a finding of guilt." *People v. Swenson*, 2020 IL 124688, ¶ 35.

¶ 27    Additionally, a reviewing a court does not retry the defendant and should not substitute its judgment for the trier of fact's "on questions involving the weight of the evidence or the credibility of witnesses." *Conway*, 2023 IL 127670, ¶ 16. Rather, it is the trier of fact's responsibility to determine the credibility of witnesses, decide the weight to give witness testimony, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *Swenson*, 2020 IL 124688, ¶ 36. "A trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *People v. Eubanks*, 2019 IL 123525, ¶ 95. "[T]he trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70. A criminal conviction will not be overturned on review "unless the evidence is so

unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Conway*, 2023 IL 127670, ¶ 16.

¶ 28 Section 11-401(a) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-401 (West 2020)) states as follows:

> "The driver of any vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until the requirements of Section 11-403 have been fulfilled."

Section 11-403 of the Vehicle Code (*id.* § 11-403) requires that drivers provide certain personal information, as well as "reasonable assistance" to an injured person, in the event of a motor vehicle accident. A violation of section 11-401(a) is a Class 4 felony. *Id.* § 11-401(c).

¶ 29 To establish defendant's guilt under the express language of section 11-401(a), the State had to prove that (1) defendant was the driver of a vehicle involved in a motor vehicle accident, (2) the accident resulted in injury to any person, and (3) defendant failed to immediately stop and remain at the scene of the accident until the requirements of section 11-403 were fulfilled. *Id.* § 11-401(a). Although section 11-401 of the Vehicle Code "does not expressly refer to a required mental state on the part of the accused," our supreme court has rejected the argument that it is an absolute liability offense and, instead, held that it "implicitly requires the mental state of knowledge on the part of a motorist." *People v. Digirolamo*, 179 Ill. 2d 24, 38 (1997). Specifically, "a conviction under section 11-401 requires the State to prove that the defendant had knowledge that the vehicle he or she was driving was involved in an accident." *Id.* at 38-39 (citing *People v. Nunn*, 77 Ill. 2d 243, 252 (1979)). It also requires "that a motorist have knowledge that he or she

was involved in an accident that *involved another person*." (Emphasis added.) *Id.* at 42.

¶ 30    In *Digirolamo*, the supreme court went on to hold that such knowledge could be established through circumstantial evidence, stating as follows:

> "By requiring the State to prove *** knowledge on the part of the motorist [that the accident involved another person], we have not imposed a burden on the State that is unrealistically difficult to sustain. The State can establish the requisite knowledge through circumstantial evidence. For instance, knowledge that another person was involved in the accident may be imputed to a driver from the circumstances of the accident." *Id.*

"Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." (Internal quotation marks omitted.) *People v. Day*, 2019 IL App (4th) 160217-B, ¶ 47. Additionally, we note that under the Criminal Code of 2012 (Criminal Code), "[k]nowledge of a material fact includes awareness of the substantial probability that the fact exists." 720 ILCS 5/4-5 (West 2020); see *People v. Moreno*, 2015 IL App (2d) 130581, ¶ 19 (citing section 4-5 of the Criminal Code in addressing a sufficiency of the evidence challenge under section 11-401 of the Vehicle Code and finding "it was reasonable for the trial court to disbelieve [the] defendant's self-serving statement that he was not aware that he had been involved in a motor-vehicle accident").

¶ 31    Here, defendant challenges only the element of his knowledge. He points out that he denied knowing a person was involved in the accident and argues he "assumed he had hit a curb." Defendant contends "[t]he State offered nothing to refute his understanding." We disagree and find sufficient circumstantial evidence was presented at trial to support a finding that defendant knew an accident occurred that involved a person.

¶ 32        Evidence showed that immediately prior to the accident, defendant and Ciavarella both arrived at the same stop intersection. Ciavarella was walking on the side of the road and positioned on the driver's side of defendant's vehicle, immediately to his left. Ciavarella testified she saw defendant, and she identified him in court. She observed that defendant also looked at her, and defendant confirmed that after stopping his vehicle, he saw "a pedestrian walking on [his] left-hand side."

¶ 33        The surveillance video showed that as defendant came to a complete stop, Ciavarella walked, without stopping, up to and into the intersection. Within seconds of stopping his vehicle and admittedly observing Ciavarella, defendant executed a left-hand turn, striking Ciavarella with the front of his vehicle. The impact caused Ciavarella's upper body to roll sideways and toward defendant's windshield. Defendant stopped his vehicle for only two to three seconds before driving away from the scene. His immediate stop indicates his awareness of the accident. Ciavarella testified she heard defendant honk his horn before driving off, further indicating defendant's knowledge of what had occurred.

¶ 34        Ultimately, the evidence shows that defendant admitted to observing Ciavarella walking into his intended path of travel only seconds before the accident occurred. Also, as the trial court noted, the surveillance video showed the impact was not a "slight hit." Given such circumstances, the court was not required to accept defendant's self-serving denials of knowledge. Additionally, although defendant suggests on appeal that he assumed he hit a curb, he testified at trial that he had assumed he hit an island or median. Defendant also acknowledged on cross-examination that he did not see an island or median either before or after making his left-hand turn. The trial court could reasonably have found defendant's explanation implausible where he testified to assuming that he hit something that he never observed in the casino's parking area while at the

same time claiming to have no knowledge of the pedestrian he had observed walking into his intended path mere seconds before he "heard a bump."

¶ 35    To support his lack of knowledge, defendant further points to the opinions of his retained expert, Meza-Arroyo. However, although Meza-Arroyo determined it would have been difficult, challenging, or unlikely for defendant to have seen Ciavarella on the night of the accident, he agreed that such was not impossible. Moreover, as noted, defendant's own testimony established that he did see Ciavarella. Critically, he made that observation only seconds before the accident, just prior to Ciavarella crossing the road onto which defendant was turning.

¶ 36    Defendant also contends that Ciavarella's testimony that "he honked and sped away without stopping" was inconsistent with the surveillance video. However, defendant mischaracterizes Ciavarella's testimony. At trial, Ciavarella stated the car that hit her stopped immediately after the accident. She heard the man in the car honk his horn and stated he then "took off" or "drove off." The surveillance video, which did not capture any audio, was entirely consistent with this account. Defendant also complains that "no one else testified to any honking" and that the State did not present testimony from Connie, the individual who helped Ciavarella after the accident and was "the one witness who could have spoken on that issue." We note, however, that Ciavarella's testimony indicated she was alone in the immediate aftermath of the accident. The surveillance video supports her testimony, showing her lying on the ground for several seconds after being hit by defendant's car without any other person in the vicinity. Nothing in the record establishes that Connie was ever in a position to witness the accident either visually or audibly. In fact, Ciavarella testified that she "told Connie what had happened" after Connie came to help her. Under the circumstances, the trial court could reasonably have accepted Ciavarella's testimony that defendant honked his horn immediately after the accident.

¶ 37 Finally, defendant contends the trial court's comments when setting forth its decision "make clear" that his knowledge that the accident involved a person "was certainly not proven beyond a reasonable doubt." He argues the court stopped short of finding that he knew he hit Ciavarella with his car and, instead, found only that he knew he hit "something." Again, we disagree. As set forth above, there was sufficient circumstantial evidence presented to establish the requisite knowledge. Further, when examined in their totality, the court's comments reflect a clear finding that defendant knew he was involved in an accident and that the accident involved a person. The court noted defendant's observation of Ciavarella at the stop intersection and found the surveillance video indicated he misjudged the speed with which Ciavarella crossed the road onto which he was turning. The court also explicitly stated that it found defendant "hit someone" and that "he knew he hit someone based on his testimony and all other relevant factors."

¶ 38 Moreover, in his posttrial motion, defendant raised the precise challenge to the sufficiency of the evidence that he now raises on appeal. The trial court denied that motion, noting it had specifically stated "on the record" that it found the evidence showed defendant knew he had hit the victim. The court stated that in reaching its determination, it relied on the surveillance video and still images from that video, as well as the testimony of all the witnesses. It further explained as follows: "In reaching my conclusion, I did feel and I did find and I still find that the Defendant was proven guilty beyond a reasonable doubt and that he knowingly hit this woman and that he left the scene of that accident."

¶ 39 The record reflects the trial court was clearly aware of the essential elements of the charged offense and found sufficient proof had been presented with respect to each element. Its guilty finding was sufficiently supported by the evidence. Accordingly, we find defendant's challenge to the sufficiency of the evidence lacks merit.

¶ 40                                      III. CONCLUSION

¶ 41            For the reasons stated, we affirm the trial court's judgment.

¶ 42            Affirmed.